# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

JAMES LANE, )
           )
      Plaintiff, )
           )
v. )
           )      CV616-024
NANCY BERRYHILL,[1] )
Acting Commissioner of )
Social Security, )
           )
      Defendant. )

## REPORT AND RECOMMENDATION

Plaintiff James Lane seeks judicial review of the Social Security Administration (SSA)'s denial of his application for Supplemental Security Income (SSI) benefits.

## I.     GOVERNING STANDARDS

In social security cases, courts

. . . review the Commissioner's decision for substantial evidence. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quotation omitted). . . . "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." *Winschel*, 631 F.3d at

---

[1]     Nancy A. Berryhill is now the Acting Commissioner of Social Security, and has been substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1178 (quotation and brackets omitted). "If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation omitted).

*Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

The burden of proving disability lies with the claimant. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The ALJ applies

. . . a five-step, "sequential" process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). If an ALJ finds a claimant disabled or not disabled at any given step, the ALJ does not go on to the next step. *Id*. § 404.1520(a)(4). At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. *Id*. § 404.1520(a)(4)(i). At the second step, the ALJ must determine whether the impairment or combination of impairments for which the claimant allegedly suffers is "severe." *Id*. § 404.1520(a)(4)(ii). At the third step, the ALJ must decide whether the claimant's severe impairments meet or medically equal a listed impairment. *Id*. § 404.1520(a)(4)(iii). If not, the ALJ must then determine at step four whether the claimant has the RFC[2] to perform her past relevant work. *Id*. § 404.1520(a)(4)(iv). If the claimant cannot perform her past relevant work, the ALJ must determine at step five whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience. An ALJ may make this determination either by applying the Medical Vocational

---

[2]    At steps four and five, the ALJ assesses the claimant's residual functional capacity (RFC) and ability to return to her past relevant work. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). RFC is what "an individual is still able to do despite the limitations caused by his or her impairments." *Id*. (citing 20 C.F.R. § 404.1545(a); *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012). "The ALJ makes the RFC determination based on all relevant medical and other evidence presented. In relevant part, the RFC determination is used to decide whether the claimant can adjust to other work under the fifth step." *Jones v. Comm'r of Soc. Sec.*, 603 F. App'x 813, 818 (11th Cir. 2015) (quotes and cite omitted).

Guidelines or by obtaining the testimony of a [Vocational Expert (VE)].

*Stone v. Comm'r. of Soc. Sec. Admin.*, 596 F. App'x, 878, 879 (11th Cir. 2015) (footnote added).

## II.   BACKGROUND

In 1993, plaintiff was found mentally disabled and awarded benefits.   Tr. 64.   After being incarcerated, however, his benefits were terminated.   *Id.*   He sought to reinstate those benefits after being released from prison, and he alleges disability beginning February 1, 1993.   Tr. 64, 191-96.   Lane has a limited (8th grade) education and claims that he attended special education classes.   Tr. 83, 214, 290.   He had full scale IQ scores of 50 and 58.   Tr. 68, 291, 353.

After a hearing, ALJ James G. Myles issued an unfavorable decision. Tr. 1-7, 64-74.   He found that Lane's degenerative disc disease, degenerative joint disease, hypertension, and post-surgical retinal detachment constituted severe impairments but did not meet or medically equal a Listing.   Tr. 66-68.   Based on the evidence of record, the ALJ found that he retained the RFC for light work, except that

> He is limited to standing/walking for only 30 minutes at a time, and after 30 minutes he must be given a two minute[ ] rest or given the option to work seated; additionally, [he] may

only occasionally climb ladders, ropes, and scaffolds, but he may frequently perform other postural activities; further, [he] must have no concentrated exposure to hazards, and his work should be routine and unskilled.

Tr. 68.

Plaintiff, he determined, had no past relevant work but could perform the requirements of work as a ticket taker, garment sorter, and garment folder. Tr. 73-74. Hence, Lane was not disabled. Tr. 74. Lane disagrees, arguing that the ALJ erred in his evaluation of his (Lane's) mental functioning and subjective pain testimony, his RFC assessment, and his finding that plaintiff was capable of performing the requirements of the identified jobs. Doc. 29.

## III. ANALYSIS

### A. Listing 12.05B

Plaintiff argues that the ALJ erred by finding his "mild mental retardation" did not meet or equal Listing 12.05B. "Intellectual disability," as defined by Listing 12.05, "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05.[3]   To qualify as intellectually disabled, a claimant's condition must satisfy this diagnostic definition and also satisfy one of four criteria specified in subparts A through D of the Listing.   20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) (stating that an impairment must satisfy the diagnostic description and one of the four sets of criteria to qualify under Listing 12.05); *see also Perkins v. Comm'r Soc. Sec. Admin.*, 553 F. App'x 870, 872 (11th Cir. 2014); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

Listing 12.05(B)'s criteria is met when a claimant presents "a valid verbal, performance, or full scale IQ of 59 or less."   20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05.   Thus, a claimant must show: (1) deficits in adaptive functioning[4]; (2) a qualifying IQ score; and (3) onset before age 22.   *See Perkins*, 553 F. App'x at 873 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 and *Hodges v. Barnhart* 276 F.3d 1265, 1268–69 (11th Cir. 2001)).

---

[3]   Effective September 3, 2013, the term "mental retardation" was replaced with "intellectual disability" in the Listings.   Change in Terminology; "Mental Retardation" to "Intellectual Disability", 78 Fed. Reg. 46499-01 (Aug. 1, 2013) (codified at 20 C.F.R. Parts 404 and 416).

[4]   The regulations give several examples of adaptive activities, including: "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."   20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00C(1).

A sub-60 IQ score triggers a rebuttable presumption of intellectual disability. *Frame v. Comm'r of Soc. Sec.*, 596 F. App'x 908, 911 (11th Cir. 2015); *Hodges*, 276 F.3d at 1269; *Cody v. Colvin*, 2015 WL 5162280 at * 3 (S.D. Ga. Sept. 2, 2015); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00 ("Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A."); *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) ("a valid I.Q. score need not be conclusive of [intellectual disability] where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) ("[IQ] test results must be examined to assure consistency with daily activities and behavior"). In general, for an ALJ to discredit an IQ score, the evidence must "overwhelmingly indicate[ ] that the claimant [is] not mentally retarded and likely attempted to tailor results to effect a desired outcome." *Siron v. Comm'r. Soc. Sec. Admin.*, 556 F. App'x 797, 799 (11th Cir. 2014) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) and *Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984)).

Here, the ALJ considered the severity of Lane's intellectual

impairments at steps two and three of the sequential evaluation. Tr. 66-68. He correctly noted that while plaintiff's most recent full-scale IQ score was assessed at 50, it was invalid and "an underestimation of his true abilities." Tr. 68; tr. 351-53 (diagnosing Lane with "malingering" and noting that his effort was "less than optimal throughout the evaluation" and that he "gave up easily with minimally challenging items."). An invalid IQ score cannot be relied upon to meet Listing 12.05.

Lane contends that the ALJ should have accepted his 1992 full-scale IQ score of 58 as *per se* evidence he met Listing 12.05B. Doc. 29 at 4. As discussed above, however, an IQ score alone is not enough to meet Listing 12.05. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(6)(a); *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 983-84 (11th Cir. 2013) ("a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."). Though the ALJ did not explicitly accept or reject the 1992 score, he explained that

> there is little evidence to suggest any serious deficit in adaptive
> function now or prior to age 22. Further, there is little evidence to
> suggest that [Lane] is dependent upon others for his personal needs,
> and while it was reported that [he] lived with his cousin, there is no
> evidence to support a finding that he was mentally unable to care for
> his needs (e.g., toileting, eating, dressing or bathing). To the

contrary, [his] cousin reported that he exhibited no problems managing his personal care, and [Lane] reported that he had minor difficulties with his ability to manage his care.

[ . . . ]

Moreover, the evidence presented does not show that [he] has another mental or physical impairment that would impose an additional and significant work-related limitation in his ability to function. Finally, there is no indication that [Lane] has marked restrictions in his activities of daily living,[5] social functioning,[6] his ability to maintain concentration, persistence or pace[7] or repeated episodes of decompensation, each of extended duration. As such, the record fails to support any deficits in adaptive function, and the decision has considered this listing even as no medical source has diagnosed this particular impairment.

Tr. 68 (footnotes added); *see also* tr. 226-33 & 252-59 (Lane's adult function reports), 244-51 (Tamika Ford's third party adult function report). A qualifying IQ score, on its own, cannot meet Listing 12.05 in the absence of deficits in adaptive functioning -- and here, there were none. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05; *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his

---

[5]  Plaintiff has only mild limitations in his activities of daily living, as he is capable of managing his personal care, preparing light meals, and doing light housework, including ironing and laundry. Tr. 67; *see* tr. 227, 231, 244, 252, 254.

[6]  Lane is only mildly limited in social functioning, as he attends church on a regular basis and his cousin reported "that he enjoys spending time with others, and that he enjoys sitting around and talking with others." Tr. 67; *see* tr. 248 & 256.

[7]  He has only mild limitation in his concentration, persistence, and pace, as he reported no difficulty handling stress or changes in his routine, was observed to have no problems following spoken instructions, and his cousin reported he has no difficulty with his ability to concentration. Tr. 67; *see* tr. 232, 249, 257-58.

impairment matches a listing, it must meet all of the specified" requirements -- "[a]n impairment that manifests only some . . . no matter how severely, does not qualify.").

Moreover, no medical source has ever opined that plaintiff met or equaled Listing-level intellectual disability. Tr. 68. Neither examining psychologist diagnosed him as meeting the Listing or being incapable of work. Tr. 292 (diagnosing plaintiff with "mild mental retardation" but opining he could perform "very routine, structure and repetitive" work), 353 (limiting plaintiff to "simple and menial types of work task[s]"); *see also* tr. 83 (testifying that he stopped working due to back and knee pain, *not* mental impairments), tr. 214 & 238 (Lane's disability application and update, reporting *no* mental impairment affecting his ability to work and attributing his inability to work to his back pain, blood pressure, and eye problems).

Having reviewed the evidence and the ALJ's discussion, the Court finds no error in the ALJ's step three assessment of Lane's intellectual functioning. Substantial evidence supports the ALJ's finding, based on an extensive review of the record, that plaintiff did not satisfy the severity criteria (a valid sub-60 IQ score *and* deficits in adaptive functioning) of

Listing 12.05B.  *Perkins*, 553 F. App'x at 873; *Harris*, 330 F. App'x at 815.

## B.    Plaintiff's Subjective Testimony

The ALJ discredited plaintiff's subjective testimony as to the debilitating extent of his symptoms because it was unsupported by the medical record, he had pursued largely conservative care, and many of his impairments are "stable."   Tr. 71.   He found Lane's testimony was further undermined by evidence of malingering, internal inconsistencies, and medically-unnecessary use of an assistive device.   Tr. 72-73.

When a claimant attempts to establish disability through his own testimony of pain and other subjective symptoms, the ALJ applies a three-part "pain standard."   *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).   It requires: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Id*.   If the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms, the ALJ then evaluates the extent to which the intensity and persistence of the

claimant's pain limits his ability to work. 20 C.F.R. §§ 404.1529(b), 416.929(b). The ALJ may consider the history and testimony, medical signs and laboratory findings, medical opinion evidence, and any other evidence of record describing how the pain affects his daily activities and ability to work. *Id.* §§ 404.1529(c), 416.929(c).

If a plaintiff "testifies as to his subjective complaints of disabling pain and other symptoms . . . the ALJ must clearly 'articulate explicit and adequate reasons' for discrediting the claimant's allegations of completely disabling symptoms." *Dyer*, 395 F.3d at 1210 (quoting *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995)). "Although this circuit does not require an explicit finding as to credibility, the implication must be obvious to the reviewing court." *Id.* (internal citation omitted). While an ALJ's credibility determination need not "cite 'particular phrases or formulations," it "cannot merely be a broad rejection which is 'not enough to enable [a reviewing court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.'" *Id.* at 1210-11 (quoting *Foote*, 67 F.3d at 1561).[8]

---

[8]  As an initial matter, Lane's argument that the Court should apply Social Security Ruling (SSR) 16-3p retroactively in its review of the Commissioner's decision is unconvincing. Doc. 29 at 6-10; *see generally Policy Interpretation Ruling Titles II and*

The ALJ pointed to numerous inconsistencies in the record between

plaintiff's subjective pain allegations and the record. Lane alleged

disabling back pain radiating bilaterally down his legs, but on

examination his gait, stance, and stability were normal and he had no

---

*XVI: Evaluation of Symptoms in Disability Claims*, 2016 WL 1119029 at *1 (implementing SSR 16-3p and superseding SSR 96-7p to "eliminate[e] the use of the term 'credibility'" from the ALJ's analysis, and "clarify that subjective symptom evaluation is not an examination of an individual's character" or "truthfulness in the manner typically used during an adversarial court litigation."); 2016 WL 1237954 at *1 (amending the effective date of SSR 16-3p to March 28, 2016).

Well-settled law establishes that administrative rules do not apply retroactively unless Congress has explicitly authorized the agency to enact retroactive rules *and* the new rule in question expressly states its retroactive effect. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law . . . administrative rules will not be construed to have retroactive effect unless their language requires this result."). SSR 16-3p lacks any retroactivity language. *See generally* SSR 16-3p, 2016 WL 1119029; 2016 WL 1237954. Accordingly, it can only apply retroactively to the ALJ's decision in this case if it merely clarifies (as opposed to changes) existing SSA policy. *See Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001).

SSR 16-3p, however, "effects much more than a mere clarification of existing SSA policy." *Bagliere v. Colvin*, 2017 WL 318834 at *6 (M.D.N.C. Jan. 23, 2017). It eliminates the term "credibility" from the ALJ's subjective testimony analysis entirely, instructing the ALJ to forgo 96-7p's "truthfulness" analysis in lieu of an objective comparison of the claimant's statements to the evidence of record. *Compare* 96-7p, 1996 WL 374186 at *4, *with* 16-3p, 2016 WL 1119029 at *2. "[B]ecause SSR 16-3p changes (rather than clarifies) existing SSA policy regarding subjective symptom evaluation, that Ruling does not apply retroactively to the ALJ's decision in this case[.]" *Bagliere*, 2017 WL 318834 at *8; *contra Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (construing SSR 16-3p as a mere clarification, rather than change, because "[t]he change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character").

Absent clear language in SSR 16-3p expressly stating its retroactive effect or binding precedent in *this* Circuit requiring reviewing courts to so apply it, the Court declines to impose the new Ruling on the ALJ's credibility analysis made prior to its enactment. Fortunately, the ALJ's careful, thorough credibility analysis survives under either 96-7p or 16-3p.

difficulty getting on and off the examination table, no tenderness to palpation of his spine, hips, or legs, and normal range of motion and full strength. Tr. 69, 70-71; *see* tr. 302-09; tr. 384-93. He alleged that he was told by doctors that without back surgery there is a chance he could become paralyzed (tr. 85-86), but there is no evidence of such a recommendation in the record. Tr. 72; *see* tr. 289-411. During emergency room visits for back pain, plaintiff was ambulatory, had no tenderness on palpation and no pain on range of motion, and required no assistive devices. Tr. 70; *see* tr. 308, 310-47; *see also* tr. 385 (reported a July 2011 back injury after which he was on crutches for two months at his consultative internal medicine examination). Radiological imaging showed only mild arthritis, degenerative joint disease, and degenerative changes (tr. 70; *see* tr. 346 & 347) and imaging of his lumbar spine revealed normal curvature, hypertrophic osteoarthritis, and degenerative changes (tr. 71; *see* tr. 406-08).

Plaintiff alleged near-blindness in his left eye, but following his February 2010 surgery, treatment notes indicated that he was doing very well and had no major problems. Tr. 69; *see* tr. 293-301, 305 (noting no functional limitations because his vision was 20/40 when wearing

13

corrective lenses). He alleged "mental retardation" but the consultative psychological examiner diagnosed malingering, assigned a GAF[9] score of 55, indicating only moderate difficulties, and opined he was capable of simple and menial work tasks. Tr. 70; *see* tr. 348-53; *see also* tr. 386 (noting his "intellectual functioning" appeared normal during internal medicine examination). He alleged illiteracy but was observed to be able to read and write. Tr. 70-71; *see* tr. 211, 386. He presented to the hearing with "crutches that do not appear to be a medical necessity," which "did not enhance [his] credibility." Tr. 72; *see* tr. 304 (noting plaintiff "does not require an assistive device for ambulation."). He alleged losing blood during urination and bowel movements, but the record is bereft of any evidence of it. Tr. 72.

In addition to these inconsistencies between plaintiff's allegations of disabling pain symptoms and the medical evidence, the ALJ correctly noted that there was no evidence of non-conservative care *or* evidence that Lane's impairments were unstable. Tr. 71. No medical source has ever

---

[9] The Global Assessment of Functioning (GAF) scale score is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. Diagnostic and Statistical Manual of Mental Disorders IV, American Psychiatric Association (4th ed. 2000) at 34.

opined that his physical *or* mental impairments prevented him from working. Tr. 70-73. And Lane's own reports that he can lift 10 pounds, stand for 15 minutes at a time, and manage his activities of daily living, all support the ALJ's ultimate RFC assessment that he can perform the requirements of light work with postural, environmental, and mental limitations. Tr. 72; *see* tr. 226-35, 243-51, 252-59l; *see also* tr. 351 (reporting he had performed yard work for a neighbor for cash).

As set forth by the ALJ:

> Given the treatment notes, opinions, and [Lane]'s statements, I have no doubt that his ability to work is limited by his impairments; however the considered evidence does not show that these limits would [ ] prevent him from working with proper allowances. The burden of proof to provide evidence that supports allegations regarding the limiting effects of [his] impairments, and their impact on [his] ability to work, rests squarely on his shoulders (SSR 88-3c). However, in this case, the evidence provided simply does not suggest that [Lane] was incapable of working at a level consistent with the [RFC]. The contrary appears to be true, as the evidence shows that [he] has the cognitive and physical functions to allow him to work in an area that does not require much interpersonal contact or anything other than routine, unskilled work. As such, I find that [Lane] is able to engage in work at a level consistent with the above [RFC].

Tr. 72. The ALJ's credibility analysis was lucid, exhaustive, and more than sufficiently supported by specific reference to the evidence of record. It objectively compared the evidence of record to Lane's statements

regarding the intensity, persistence, and duration of the limitations imposed by his symptoms in exactly the manner directed by the SSA. *See both* SSR 96-7p *and* SSR 16-3p.

## C. RFC Assessment

Plaintiff alleges the ALJ erred by failing to include vision-related limitations in his RFC assessment. Doc. 29 at 10-11. Had the ALJ included such a limitation, Lane contends it would have eliminated the three representative occupations identified by the VE as all three require "frequent" near visual acuity. *Id.* at 11-12.

The record shows that plaintiff's corrective surgery restored some vision to his left eye. Tr. 295. While his vision was impaired, no medical source *ever* opined that it imposed a functional limitation on his ability to work. *See* tr. 304-05. And during the 2012 examination, where his vision was observed to be significantly impaired even with the use of corrective lenses, the examining physician did *not* opine to any functional limitation imposed by his decreased acuity. *See* 388-89.

Regardless, plaintiff relies on his visual acuity with use of a Snellen chart, [10] which tests "far" visual acuity from 20 feet, while the jobs

---

[10]    The Snellen chart is a standardized chart containing letters of different sizes that

identified by the VE require frequent "near" visual acuity. *See* Dictionary of Occupational Titles (DOT) 222.687-014 (garment sorter, "far acuity" "not present"), 369.687-018 (garment folder, same), 344.667-010 (ticket taker, same). Because plaintiff did not have any near acuity impairment, the ALJ had no reason to incorporate one into his RFC assessment.

## D.    VE Testimony

Plaintiff finally contends the ALJ erroneously relied on the VE's testimony that plaintiff could perform the mental requirements of the identified jobs, and that regardless, the jobs do not exist in sufficient numbers in the national economy to support a finding he can work. Doc. 29 at 12-16. The ALJ had limited Lane's mental functional capacity to "routine and unskilled work," consistent with the medical evidence supporting a restriction imposed by his low-IQ. Tr. 68.

After confirming that his testimony was consistent with the DOT pursuant to SSR 00-4p (tr. 74, 89 & 90), the VE testified that a hypothetical individual of plaintiff's same age, education, work experience, and functional restrictions could work as a garment sorter,

is used to assess visual acuity. *See* https:// www.nlm.nih.gov/medlineplus/ency/ article/003396.htm (last visited January 27, 2017).

garment folder, and ticket taker. Tr. 89-90. All three jobs are light, unskilled work with an SVP [11] of 2 and reasoning level of 2 [12]. DOT 222.687-014, 369.687-018, 344.667-010. Lane contends the ALJ erred by relying on the VE's testimony, because a reasoning level of 2 is "inconsistent" with the ALJ's assessment that he is only capable of "routine and unskilled work." Doc. 29 at 12-13.

While some courts have held that a reasoning level of 2 is inconsistent with a limitation to simple, repetitive work,[13] *see* doc. 29 at 13 (citing *Hall v. Astrue,* M.D. Fla. No. CV209-113 (M.D. Fla. Dec. 7, 2010)), the Eleventh Circuit has not. And in the absence of controlling law, the Court finds other Circuits' reasoning persuasive that level 2 reasoning is *consistent* with a limitation to simple, repetitive work. *See, e.g., Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015) (finding an RFC restriction to "simple, routine, or repetitive work" consistent with level 2,

[11]    Specific Vocational Preparation (SVP) is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, App. C. An SVP of 2 would require "[a]nything beyond short demonstration up to and including 1 month" for a worker to learn their duties.

[12]    A reasoning level of 2 requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations."

[13]    The ALJ's assessed restriction to "routine and unskilled" work correlates to the standard limitation to "simple and repetitive" work.

but not level 3, reasoning); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (same); *see also Money v. Barnhart*, 91 F. Appx. 210, 215 (3d Cir. 2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). Thus, the ALJ did not err in relying on the VE's testimony that plaintiff could perform level-2 reasoning work. SSR 00-4p.

Nor did the ALJ err by relying on the VE's testimony that the identified jobs existed in "significant numbers" in the national economy. Tr. 73-74; tr. 89-90. Even crediting, *arguendo*, plaintiff's allegations that there are only 8 garment sorter, 135 garment folder, and 6,809 ticket taker jobs available nationwide (*see* doc. 29 at 14), these are sufficiently significant numbers to support the ALJ's disability determination.

Work exists in the national economy if it exists in significant numbers either in the region where a claimant lives or in several regions of the country. *See* 42 U.S.C. §§ 1382c(a)(3)(B); 423(d)(2)(A); 404.1566(a); *Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015) ("the appropriate focus is the national economy."). As to what constitutes a "significant number" in this context, there is no bright-line rule:

> This Court has never held that a minimum numerical count of jobs must be identified in order to constitute work that "exists in significant numbers" under the statute and regulations. We have concluded, however, that the "appropriate focus under the regulation is the national economy," not the local economy in which the claimant lives.

*Atha*, 616 F. App'x at 934 (440 jobs locally and 23,800 jobs nationally sufficient). And the number can be lower than a plaintiff would like, and still count as "significant." *See Brooks v. Barnhart*, 133 F. App'x 669, 670-71 (11th Cir. 2005) (840 jobs nationally sufficient). Here, plaintiff concedes that *at least* 6,809 ticket taker positions exist in the national economy, a significant number for the purposes of the Step 5 analysis. *Id.*; *see also* 20 C.F.R. § 416.966(b) (the Commissioner only needs to identify "*one* or more occupations" at Step 5 to support a non-disability finding) (italics added). The ALJ did not err in relying on the VE's testimony at Step 5.

## IV. CONCLUSION

Because the ALJ's decision is supported by substantial evidence in the record, the Commissioner's final decision should be **AFFIRMED**.

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may

file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. U.S.*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this ___16th___ day of February, 2017.



UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA